**TRUCKERS UNITED FOR SAFETY, et al., Appellants,**

v.

**Kenneth M. MEAD, The Inspector General, Department of Transportation, Appellee.**

**No. 00–5175.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 2001.

Decided June 5, 2001.

Anthony J. McMahon argued the cause and filed the briefs for appellants. Edward M. McClure entered an appearance.

Eric M. Jaffe, Assistant United States Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, United States Attorney at the time the brief was filed, and R. Craig Lawrence, Assistant United States Attorney.

Before: EDWARDS, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

In keeping with its mission to enforce motor carrier safety regulations, the Office of Motor Carriers ("OMC") initiated compliance review investigations into appellants' record keeping practices. As part of that effort, the Department of Transportation's Office of Inspector General ("DOT OIG") was engaged to use its purported search and seizure authority to obtain appellants' business records. Under the legal framework in effect at the time of the underlying events, the Inspector General Act of 1978, Pub.L. No. 95–452, 92 Stat. 1101 (1978) ("Inspector General Act" or "Act"), the Inspector General ("IG") had no authority to engage in the kinds of criminal investigations at issue here–criminal investigations that are at the heart of an agency's general compliance enforcement responsibilities. We therefore hold that appellants are entitled to the return of records and other property seized from them during the IG's *ultra vires* investigations and seizures.

Following the IG's investigation of appellants, and subsequent to appellants' filing of the lawsuit in this case, Congress enacted the Motor Carrier Safety Improvement Act of 1999, Pub.L. No. 106–159, 113 Stat. 1748, 1773 (1999) ("MCSIA"). The District Court found that the MCSIA granted the IG new authority to conduct investigations of motor carriers' fraudulent and criminal activities related to DOT's operations and programs. *Truckers United for Safety v. Mead*, 86 F.Supp.2d 1, 19 (D.D.C.2000). In reaching this conclusion, the District Court correctly rejected the IG's argument that the 1999 law merely clarified that his office always possessed the authority to conduct such investigations. *Id.* at 19 n. 7. It is also undisputed that the MCSIA does not retroactively authorize IG investigations that were conducted prior to its enactment. Therefore, the District Court erred in holding that, although the IG violated the Inspector General Act, he was nonetheless entitled to summary judgment because the actions taken by the IG in 1998 are authorized by the 1999 law. .

Finally, appellants contend that, because there is a threat that the office of the IG will exceed its authority under the MCSIA, we should construe the new law narrowly and then grant an injunction preventing the IG from violating the statute in the future. Although appellants are entitled to relief for unlawful actions taken pursuant to the Inspector General Act, there is no live dispute under the MCSIA. Accordingly, we vacate the District Court's decision insofar as it purports to construe the MCSIA, and we dismiss appellants' claims resting on their construction of the MCSIA; the issues focused on the meaning and future application of the MCSIA are not ripe for review.

## I. BACKGROUND

### A. Statutory Framework

#### 1. Inspector General Act

The Inspector General Act established the Office of Inspector General ("OIG") in

order to facilitate "objective inquiries into bureaucratic waste ... and mismanagement." *NASA v. Fed. Labor Relations Auth.*, 527 U.S. 229, 240, 119 S.Ct. 1979, 144 L.Ed.2d 258 (1999). The IG's mandate focuses on systemic agency-wide issues. Congress created the OIG to "provide leadership and coordination and recommend policies for activities designed ... to promote economy, efficiency, and effectiveness in the administration of, and ... to prevent and detect fraud and abuse in, such programs and operations." 5 U.S.C.App. 3 § 2(2). There are limits to the IG's powers, however. Most prominently, the Act specifically prohibits the OIG from assuming "program operating responsibilities." 5 U.S.C.App. 3 § 9(a)(2).

The general parameters of the Inspector General Act are fairly clear cut. First, Congress consolidated pre-existing agency offices into the OIG, thereby transferring the various offices' investigative duties to the OIG. In the case of the DOT, Congress mandated that the responsibilities of offices such as the "Office of Investigations and Security" and the "Office of Audit" be consolidated into the OIG. 5 U.S.C.App. 3 § 9(a)(1)(k). Second, the Act defines the IG's core role as preventing fraud and abuse, by conducting audits and investigations relating to agency programs and operations. 5 U.S.C.App. 3 §§ 2(1), 4(a)(1), 6(a)(2). Finally, Congress authorized agencies to make discretionary transfers of duties to the OIG. However, discretionary transfers of authority only can be made if the duties are properly related to the functions of the IG, further the purpose of the Act, and do not constitute program operating responsibilities. 5 U.S.C.App. 3 § 9(a)(2).

Congress structured the OIG to promote independence and objectivity. The Inspector General Act indicates that Inspectors General will be appointed directly by the President and confirmed by the Senate. 5 U.S.C.App. 3 § 3(a). An IG is under the general supervision of the head of the agency, but the head of the agency may not interfere with any IG investigation. *Id.* In a similar vein, Inspectors General report directly to Congress regarding their agencies. *Id.* Furthermore, the OIG has investigatory means at its disposal, such as subpoena power and access to regulated motor carriers' records to aid it in fulfilling its mission. 5 U.S.C.App. 3 §§ 3(a), 6(a). The OIG also may, in appropriate circumstances, conduct searches and seizures. *See* 28 C.F.R. § 60.3.

In 1999 Congress passed the MCSIA which further addresses the power of the DOT IG. In particular, § 228 of the MCSIA states:

(a) IN GENERAL.—The statutory authority of the Inspector General of the Department of Transportation includes authority to conduct, pursuant to Federal criminal statutes, investigations of allegations that a person or entity has engaged in fraudulent or other criminal activity relating to the programs and operations of the Department or its operating administrations.

(b) REGULATED ENTITIES.—The authority to conduct investigations referred to in subsection (a) extends to any person or entity subject to the laws and regulations of the Department or its operating administrations, whether or not they are recipients of funds from the Department or its operating administrations.

§ 228, 113 Stat. at 1773. This statutory provision was not in effect when the IG investigated appellants.

2. Operations of the Department of Transportation

Under the Motor Carrier Safety Act of 1984, Pub.L. No. 98–554, 98 Stat. 2829

(1984), the Secretary of the DOT has authority to issue regulations governing vehicle safety. *See, e.g.,* 49 U.S.C. § 31133(a). The Secretary's authority includes the power to initiate an investigation, subpoena witnesses and records, and inspect motor carriers or documents belonging to motor carriers. 49 U.S.C. §§ 502(a), 504(c)(1)-(2), 506(a). The IG has no responsibility in these areas of operation.

The Secretary of Transportation has delegated this authority to the Federal Highway Administration ("FHA"), which in turn has issued federal motor carrier safety regulations. *See* 49 U.S.C. § 104; 49 C.F.R. §§ 350.1–399.207. Until January 1, 2000, FHA's Office of Motor Carriers administered the regulation of interstate motor carriers. However, pursuant to the MCSIA, responsibility for administering regulations governing interstate motor carriers was transferred to the Federal Motor Carrier Safety Administration ("FMCSA").

The Motor Carrier Safety Act of 1984 authorizes the FHA to enforce safety regulations and conduct compliance reviews. 49 U.S.C. § 31115. The FHA can itself bring a civil action or request that the Attorney General enforce a regulation or prosecute an alleged violator. 49 U.S.C. § 507 (b). The Act prescribes both civil and criminal penalties for violations of the safety regulations. 49 U.S.C. § 521. Although the FHA is authorized to oversee motor carrier compliance with safety regulations, the Motor Carrier Safety Act of 1984 does not authorize the FHA to engage in searches and seizures.

## B.  Underlying Events

During the period preceding the events at issue in this case, the DOT OIG and the OMC embarked on a joint project reviewing motor carrier operations. *See* Joint OIG/OMC Review of Motor Carrier Operations, *reprinted in* J.A. 40. The "objective" of the joint project was "to combine the efforts of OIG and OMC staffs in a joint investigative review of specific motor carriers to create a greater deterrence to motor carrier violations of the Federal Motor Carrier Safety Regulations." *Id.* The effort targeted "all motor carrier operating areas subject to falsification and having a direct impact on safety," including drivers' hours of service, driver medical certificates and testing for drugs. *Id.* The document describing the joint project specifically noted that the "focus of the review will not be on OMC operations." *Id.* Under this project, according to appellees, the OMC engages in regulatory compliance reviews of motor carriers and refers egregious violators to the IG. The IG pursues criminal investigation of the misconduct.

Appellants, Florilli, Northland, Kistler, Lone Wolf, and K&C, individual trucking companies, each have been investigated by the DOT IG. The record on appeal describes events involving K & C and Lone Wolf, companies operating from the same location, to illustrate the role the IG played in investigating appellants. On July 13, 1998 the OMC sent an investigator to K & C and Lone Wolf to conduct a compliance review. Subpoena (July 14, 1998), *reprinted in* J.A. 66. Lone Wolf believed that the review had been triggered by a complaint filed by a disgruntled driver. DOT asserted that the investigation was an attempt to uncover falsification of "hours of service" logs, that is, records of the number of consecutive hours drivers are on the road without a rest. The Company refused to cooperate with the compliance review, although it agreed to comply with the investigation of the underlying complaint. Letter from Lone Wolf Counsel, *reprinted in* J.A. 54. On July 14, 1998 the OMC served a subpoena on the compa-

nies demanding that the companies produce all documents necessary to the investigation. Subpoena (July 15, 1998), *reprinted in* J.A. 66. The companies refused to comply. On October 22, 1998 a special agent of the DOT IG, Eric Johnson, obtained a warrant to search the premises of the companies. Search Warrant (Oct. 22, 1998), *reprinted in* J.A. 73. On the following day, Johnson executed the search warrant and seized the relevant documents. *See* Declarations, *reprinted in* J.A. 57, 58, 60, 62, 64, 65.

### C. Procedural History

Truckers United for Safety ("TUFS"), a nonprofit organization of motor carriers, along with the individually named companies, filed suit in District Court alleging that the DOT IG lacked legal authority to engage in the contested compliance review investigations. Appellants sought preliminary injunction and declaratory relief because, they argued, the IG was not authorized to engage in DOT operations, specifically investigation of standard compliance with federal motor carrier safety regulations. Appellants also sought the return of any seized materials that had not already been returned by the Government. Appellee filed a motion for summary judgment, asserting that TUFS lacked standing and that the DOT IG acted within its authority in authorizing the investigations.

The District Court found that the Inspector General Act did not authorize the DOT IG to conduct investigations into motor carrier compliance. *Truckers United for Safety v. Mead*, 86 F.Supp.2d at 19. As a result the IG had no authority to search appellants' premises or seize their records. *Id.* However, the District Court found that the MCSIA amended the Inspector General Act, and constituted a new grant of authority broad enough to encom-

pass the kind of investigations at issue here. *Id.* Although the OIG did not have the authority to investigate appellants as part of a compliance review in 1998, the District Court explained that the MCSIA has given the IG authority to do so in the future. *Id.* The District Court therefore concluded that the IG was entitled to summary judgment on the merits. *Id.* Because appellants' claims arise from an appeal of a summary judgment ruling, we review the District Court's ruling *de novo*. *See, e.g., Ctr. for Auto Safety v. NHTSA*, 244 F.3d 144, 147 (D.C.Cir.2001).

## II. DISCUSSION

### A. Standing

■ The IG has asserted, and the District Court agreed, that TUFS lacks standing to pursue claims on behalf of its members, the individual trucking companies. We find this argument to be plainly wrong.

TUFS asserts no basis for *organizational standing*, see *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), *Am. Trucking Ass'ns v. United States Dep't of Transp.*, 166 F.3d 374, 386 (D.C.Cir.1999), because it asserts no cognizable injury to the organization or its activities. It is clear, however, that TUFS has asserted more than enough to satisfy the requirements of *representational standing*. *See, e.g., Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (setting out the requirements for associations to have standing); *Am. Trucking*, 166 F.3d at 385; *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1482–83 (1994).

TUFS asserts, and the Government does not dispute, that the individual trucking companies are members of the association. TUFS further claims that the IG injured individual trucking companies by conduct-

ing unlawful investigations and seizing their records. These claims, which are substantial and well documented, easily satisfy the injury/causation/redressability requirements of Article III of the Constitution. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Furthermore, it is uncontested that TUFS' members have standing to sue in their own right; the interests that TUFS seeks to protect are indisputably germane to the organization's purpose; and neither the claims asserted nor the relief requested requires the participation in the lawsuit of each of the organization's individual members. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. TUFS therefore has representational standing to sue on behalf of its members.

B. The Legality of the IG's Investigations and Seizures in 1998 Pursuant to the Inspector General Act

■ The principal issue in this case is whether the IG had authority in 1998 to investigate motor carriers' compliance with safety regulations. The District Court held that the legislative history and structure of the Inspector General Act make it plain that Congress did not intend to grant the IG authority to conduct investigations constituting an integral part of DOT programs. The trial court also held that the Secretary of DOT could not transfer to the IG his authority to investigate motor carriers' compliance with federal motor carrier safety regulations. The District Court therefore concluded that the IG acted outside the scope of his authority in conducting investigations of motor carriers' compliance with the federal safety regulations. We agree with this conclusion.

The IG has authority to investigate the DOT's administration of programs and operations. In carrying out its charge, "honest cooperation" between the IG and agen-

cy personnel can be expected. *NASA,* 527 U.S. at 242, 119 S.Ct. 1979. The IG, however, is not authorized to conduct investigations as part of enforcing motor carrier safety regulations—a role which is central to the basic operations of the agency. *See, e.g., Winters Ranch P'ship v. Viadero,* 123 F.3d 327 (5th Cir.1997) (upholding IG's subpoena because it was part of an investigation to test the effectiveness of the agency's conduct of a program and not part of program operating responsibilities); *Burlington N. R.R. Co. v. Office of Inspector General,* 983 F.2d 631 (5th Cir.1993) (refusing to enforce IG's subpoena because Inspectors General have no authority to engage in regulatory compliance investigations that are part of an agency's general functioning).

The record in this case makes it clear that, when he investigated the plaintiffs and seized their records, the DOT IG was not engaged in an investigation relating to abuse and mismanagement in the administration of the DOT or an audit of agency enforcement procedures or policies. Rather, the DOT IG merely lent his search and seizure authority to standard OMC enforcement investigations. In other words, the DOT IG involved himself in a routine agency investigation that was designed to determine whether individual trucking companies were complying with federal motor carrier safety regulations. This was beyond his authority.

Under 5 U.S.C.App. 3 § 9(a)(1)(K), the Office of Investigations and Security, Office of Audit of the Department, the Offices of Investigations and Security, Federal Aviation Administration, and External Audit Divisions, Federal Aviation Administration, the Investigations Division and the External Audit Division of the Office of Program Review and Investigation, Federal Highway Administration, and the Office of Program Audits, Urban Mass Transpor-

tation Administration were consolidated as part of the OIG. Congress did not, however, indicate that these investigative units were to conduct investigations into motor carrier compliance with safety regulations or that consolidation of these offices authorized the OIG to engage in criminal investigations of particular motor carriers, in contravention of the Inspector General Act. 5 U.S.C.App. 3 § 9(a)(2). The DOT IG was not authorized, pursuant to the Act's consolidation of duties, to search appellants' premises and seize their records as part of a compliance review which was under the jurisdiction of the FHA.

Finally, under 5 U.S.C.App. 3 § 9(a)(2), the Secretary of DOT may transfer additional powers and duties to the IG beyond those responsibilities specifically defined in the Inspector General Act. However, the Secretary's transfer of authority is explicitly limited to exclude matters that constitute "program operating responsibilities." *Id.* As the District Court correctly found, there was no valid transfer of authority in this case.

On the record at hand, there can be no doubt that the IG violated the Inspector General Act when he conducted the disputed investigations and seizures of appellants' records in 1998. The actions of the IG were *ultra vires,* causing injury to appellants for which they are entitled to relief.

### C. Actions Arising Under the MCSIA

■ The District Court found that, as of December 1999, after the occurrence of the investigations and seizures that are in dispute in this case, the IG was granted authority pursuant to the MCSIA "to conduct investigations of motor carriers' fraudulent and criminal activities that are related to the DOT's operations and programs." *Truckers United for Safety v. Mead,* 86 F.Supp.2d at 19. The District

Court's opinion thus appears to suggest that the enactment of the MCSIA mooted appellants' challenges to the IG's unlawful actions taken before its passage. *Id.* That holding is erroneous and it is hereby reversed. The District Court also denied appellants' request for declaratory and injunctive relief that would bar the IG from engaging in unlawful actions in the future pursuant to the MCSIA. Because appellants' claims rest on a fear of injuries that have yet to arise under the MCSIA, we dismiss them as unripe.

The IG argues that even though the MCSIA does not directly govern the 1998 investigations, the MCSIA provides evidence that, even in 1998 before the MCSIA was enacted, the OIG had authority to investigate appellants. To substantiate this position, the IG points to a comment in the Congressional Record that § 228 "clarifies Congressional intent with respect to the authority of the IG, reaffirming the IG's ability and authority to continue to conduct criminal investigations of parties subject to DOT laws or regulations, whether or not such parties receive Federal funds from the Department." 145 Cong. Rec. H12874 (daily ed. Nov. 18, 1999); 145 Cong. Rec. S15211 (daily ed. Nov. 19, 1999). This sparse piece of legislative history cannot carry the day for the IG.

Prior to the passage of § 228, the statutory and legal framework defining the IG's authority focused on the IG's role as an independent and objective investigator of agency fraud and abuse. These responsibilities contrasted with the responsibilities delegated to other offices in the DOT which were in charge of implementation and enforcement of the motor carrier safety regulations. Within this institutional framework the IG was not authorized to engage in ordinary compliance reviews, even those potentially implicating criminal

punishments. The characterization of the MCSIA as "clarifying" in the Congressional Record does not undermine this finding. The DOT's attempt to read § 228 as a retroactive authority has no legitimate basis.

A much harder question in this case concerns appellants' requests for a judicial declaration that § 228 of the MCSIA did not amend the Inspector General Act to authorize the IG to conduct investigations of the sort that are at issue in this case and an injunction barring such criminal investigations in the future. In other words, appellants ask that we reverse the District Court's holding that § 228 of the MCSIA created *new* authority for the DOT IG. Section 228—for example, the language sanctioning IG investigations of "fraudulent or other criminal activity"—is hardly free from ambiguity and it is far from clear that it expands the authority of the IG as the District Court found. We need not reach these issues, however. We agree that the District Court's decision construing the MCSIA cannot stand, but not for the reasons asserted by appellants. Rather, we hereby vacate the District Court's decision insofar as it addresses the scope of the MCSIA, because the issues raised by appellants regarding the scope of § 228 are not ripe for review.

The disputed actions taken by the IG in this case occurred in 1998 under the Inspector General Act. The MCSIA had not yet been enacted, so there is no evidence before the court concerning investigations or seizures taken pursuant to the MCSIA. Appellants claim that the IG's future conduct under the MCSIA may violate the law; but, of course, this court has no way of knowing what the DOT IG may do in the future. The only matters of relevance that are before the court at this time are the text of § 228 of the MCSIA, the District Court's construction of the statutory provision, and the parties' differing opinions as to what the new law means. This is not enough to justify an opinion from this court on the meaning of § 228, because such an opinion would be purely "advisory" and thus beyond this court's authority under Article III of the Constitution. *Cf. Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (Speculative claims about possible future harms do not afford a basis for equitable relief.).

There will be no ripe case fit for judicial review until the Government acts to apply the statute "in a concrete factual setting." *Truckers United for Safety v. Fed. Highway Admin.,* 139 F.3d 934, 937 (D.C.Cir.1998) (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *rev'd on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). It is possible that, since passage of the MCSIA, the DOT IG has, in practice, properly exercised its authority. Without any particular action by the IG before us for review, the question of future relief is not fit for determination.

In assessing whether a case is ripe for review, we must consider not only the "fitness of the issues" for judicial review, but also whether a delay in judicial consideration of the issues will cause undue "hardship" to appellants. *See City of Houston v. Dep't of Hous. & Urban Dev.,* 24 F.3d 1421, 1431–32 (D.C.Cir.1994). The closest appellants come to raising a claim of hardship is in asserting that the investigations of Florilli, Kistler, K & C and Lone Wolf are "continuing," implying that appellants persist in being harmed as a result of the underlying events. However, this harm results from searches and seizures authorized by the IG in 1998, not actions initiated by the IG following the enactment of the MCSIA.

The main hardship that may result to appellants from delayed review of the IG's proper role under the MCSIA is the need to file another suit. However, the burden of pursuing future litigation is not enough, by itself, to demonstrate hardship justifying premature judicial decision-making. *See id.* at 1432.

### III. CONCLUSION

Because the DOT IG acted without lawful authority in investigating appellants and seizing their records pursuant to the Inspector General Act, the Government is hereby ordered to return all materials seized during the *ultra vires* searches of appellants' premises. We also hereby vacate the District Court's decision regarding the scope of § 228 of the MCSIA and dismiss appellants' claims resting on their construction of the MCSIA; the issues focused on the meaning and future application of § 228 are not ripe for review.